❏ Original ❏ D **CLERK'S OFFICE**

A TRUE COPY

Oct 21, 2022

s/ JDH

Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| Information associated with email address: idtr_black@yahoo.com, which is stored at premises owned, maintained, controlled, and operated by Oath Holdings Inc., as further described in Attachment A. | ) ) ) ) |

Case No. **22-M-575 (SCD)**

Matter No. 2019R00155

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before     11-4-22     *(not to exceed 14 days)*

❏ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to     Hon. Stephen C. Dries     .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❏ for _____ days *(not to exceed 30)* ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:     10-21-22 9:50 am     _____
*Judge's signature*

City and state:     Milwaukee, Wisconsin     Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the following email address that is stored at premises controlled by Oath Holdings, 701 First Avenue, Sunnyvale, CA 94089.

**Target Account: idtr_black@yahoo.com**

**ATTACHMENT B**

**Particular Things to be Seized**

**I.      Information to be disclosed by Oath Holdings (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is stored, held or maintained inside or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A, for the time periods of:

- January 1, 2016, through December 31, 2018; and

- May 11, 2022, to the present.

a.      The contents of all e-mails associated with the account, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      The types of service utilized;

d.      All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken;

f.      All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Yahoo!; and

g.      For all information required to be disclosed pursuant to this warrant, the physical location or locations where the information is stored.

The Provider is hereby ordered to disclose the above information to the government within fourteen days of the issuance of this warrant.

## II.      Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Sections 1956 and 1957 and occurring after January 1, 2016, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.      The importation and distribution of controlled substances and other non-controlled substances or other items used to increase the volume of controlled substances and enhance drug trafficking activities.

b.      Information relating to who created, used, or communicated with the account or identifier, including records about their identities and whereabouts.

c.      Information relating to the laundering of proceeds of drug sales.

# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin



CLERK'S OFFICE
A TRUE COPY
Oct 21, 2022
s/JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| Information associated with email address: idtr_black@yahoo.com, which is stored at premises owned, maintained, controlled, or operated by Oath Holdings Inc., as further described in Attachment A. | ) ) ) ) |

Case No.  **22-M-575 (SCD)**

Matter No. 2019R00155

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§§ 841(a)(1); 843 (b); & 846 | Possession, distribution, and conspiracy to possess and distribute controlled substance. |
| 18 U.S.C. §§ 1956 & 1957 | Money laundering. |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

MATTHEW COOPER (Affiliate)  Digitally signed by MATTHEW COOPER (Affiliate)
Date: 2022.10.20 15:25:40 -05'00'

*Applicant's signature*

DEA TFO Matthew Cooper

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means).*

Date:  10-21-22

*Judge's signature*

City and state:  Milwaukee, Wisconsin

Honorable Stephen C. Dries, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## APPLICATION FOR SEARCH WARRANT

I, Matthew J. Cooper, being first duly sworn, hereby depose and state as follows:

## I.   INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information associated with an email account that is stored at premises controlled by Oath Holdings, 701 First Avenue, Sunnyvale, CA 94089.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Oath Holdings to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.     I am employed as a Detective with the Milwaukee Police Department and have been a law enforcement officer for over 25 years.  I have been a Detective for over 19 years and have been assigned to conduct narcotics investigations for over 18 years.  I was previously assigned to the Vice Control Division (Narcotics) as a Police Officer for over 2 years.  I have been assigned to the High Intensity Drug Trafficking Area (HIDTA) for over 14 years.  I am also a Task Force Officer with the United States Department of Justice, Drug Enforcement Administration (DEA), and have been since October, 2008.  As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

3.     I have participated in numerous complex narcotics investigations which involved violations of state and federal controlled substances laws and money laundering laws including Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections 1956 and 1957, and other related offenses. I have had both formal training and have participated in numerous complex drug trafficking investigations, including ones using wiretaps. More specifically, my training and experience includes the following:

a.     I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States and internationally;

b.     I am familiar with the coded language utilized over the telephone and other electronic communications to discuss drug trafficking and know that the language is often limited, guarded and coded. I also know the various code names used to describe controlled substances;

c.     I know drug dealers often put telephones in the names of others (nominees) in order to distance themselves from telephones that they use to facilitate drug distribution. Because drug traffickers go through many telephone numbers, they often do not pay final bills when they are done using a telephone number and then are unable to put another line in the name of that subscriber;

d.     I know drug traffickers often purchase and/or title assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in names other than the drug traffickers', the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

e.     I know drug traffickers must maintain on-hand large amounts of currency to include currency stored in financial accounts readily accessible in order to maintain and finance their ongoing drug business;

f.     I know it is common for drug traffickers to maintain books, records, receipts, notes ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. The aforementioned book, records,

2

receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them. These may be in paper form as well as in digital form on computers, Smartphones, cellphones, and other electronic media or electronic storage devices;

g.   I know it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, their businesses, and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities;

h.   I know it is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the traffickers within residences, businesses or other locations over which they maintain dominion and control, as well as in digital form on computers, Smartphones, cellphones, and other electronic media or electronic storage devices;

i.   I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), pagers, computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record, and/or store the information described in the items above, as well as conduct drug trafficking activities;

j.   I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency;

k.   I know drug traffickers commonly maintain addresses or telephone numbers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization in papers and books  as well as in digital form on computers, Smartphones, cellphones, and other electronic media or electronic storage devices;

3

l.    I know drug traffickers take or cause to be taken photographs or videos of themselves; their associates, their property and their drugs. These traffickers usually maintain these photographs or videos in their possession, often in digital form on computers, Smartphones, cellphones, and other electronic media or electronic storage devices;

m.    I am familiar with computers, cellular telephones, Smartphones, pagers and their uses by drug traffickers to communicate with suppliers, customers, and fellow traffickers; Drug traffickers use these devices to record their transactions and aspects of their lifestyle related to drug dealing, whether in the form of voicemail, email, text messages, video and audio clips, floppy disks, hard disk drives, thumbnail drives, CD's, DVD's, optical disks, Zip disks, flash memory cards, Smart media and any data contained within such computers or cellular telephones, electronic storage media and other settings particular to such devices; I know that such devices automatically record aspects of such communications, such as lists of calls and communications, and any particularized identification assigned to those source numbers or email addresses by the owner of the devices; and

n.    I know the following information can be retrieved to show evidence of use of a computer or Smartphone to further the drug trade: system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such systems; computer media and any data contained within such media; operating system software, application or access program disks, manuals, books, brochures, or notes, computer access codes, user names, log files, configuration files, passwords, screen names, email addresses, IP addresses, and SIM cards.

4.    I am currently participating in an investigation of a fentanyl trafficking organization led by Jonte MARSHALL, hereinafter referred to as the MARSHALL DTO. I am familiar with the facts and circumstances regarding this investigation as a result of my personal participation in this investigation, and my review of: (a) consensually recorded telephone conversations and face-to-face meetings; (b) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers, all of whom I believe to be truthful and reliable; and (c) information obtained from cooperating citizen witnesses, confidential sources, and defendants,

4

whose reliability is established herein.[1]  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Sections 1956 and 1957, have been committed, are being committed, and will be committed by Jonte MARSHALL, Shomari HOOPER, Lemonda WARD, Oscar RAMIREZ-RIVERA, and others not yet identified.  Those facts further demonstrate that Jonte MARSHALL is using the email address **idtr_black@yahoo.com** to further his drug trafficking and money laundering activities.  There is also probable cause to search the locations described in Attachment A for fruits, evidence, and instrumentalities of these crimes, as further described in Attachment B.

## II.      PROBABLE CAUSE

### Background

6.      In April 2019, case agents met with a confidential source, hereinafter referred to as "CS-1."[2]   CS-1 provided information regarding suspects involved in drug trafficking in the Milwaukee, Wisconsin, area.  CS-1 identified Jonte MARSHALL as a large-scale distributor of heroin, cocaine, and marijuana in the Milwaukee area.  Case agents are aware, based on reviews

---

[1] Throughout this affidavit, reference will be made to case agents.  Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

[2] Case agents believe CS-1 is a reliable person because CS-1 has provided information which law enforcement has been able to corroborate through independent investigations, CS-1 has provided statements against CS-1's own penal interests, and CS-1 has conducted controlled buys of narcotics for law enforcement.  CS-1's adult criminal history includes two misdemeanor convictions and one felony conviction.  CS-1 is cooperating in exchange for consideration on a pending felony arrest.  Criminal charges were subsequently declined based on CS-1's cooperation.  CS-1 was paid a total of $3,000 on four separate occasions for providing information on multiple felony offenses occurring in the Milwaukee area.

5

of law enforcement databases, that Jonte MARSHALL has been identified as a large-scale distributor of narcotics in the Milwaukee, Wisconsin area since 2008. CS-1 identified one of MARSHALL's phone numbers as (414) 779-1998. CS-1 identified MARSHALL's residence as a duplex at 1929 and 1931 South 97th Street, West Allis, Wisconsin. CS-1 stated this residence is a duplex owned by MARSHALL. MARSHALL lives in the lower unit of the duplex and stores drugs in the upper unit of the duplex. CS-1 stated that MARSHALL carries a pistol on his person at all times.

7.      CS-1 believed that Jonte MARSHALL receives at least some of his drugs through the mail. On one occasion, CS-1 was at the residence of MARSHALL's associate, Corey Vance, when a third subject was at the residence waiting to receive a parcel believed to contain drugs. CS-1 left the residence before the parcel arrived. CS-1 stated MARSHALL owns a residence in Arizona and travels to Arizona frequently to conduct drug trafficking activities.

8.      CS-1 identified another subject involved in drug trafficking with Jonte MARSHALL as Corey Vance. CS-1 stated Vance distributes large amounts of heroin, cocaine, and marijuana for MARSHALL. CS-1 identified Vance's residence as 5908 North 69th Street, Milwaukee, Wisconsin. CS-1 stated Vance lives at this residence with his mother. CS-1 stated that within several days of the interview CS-1 had been inside this residence and seen five different handguns. CS-1 further stated that Vance always carries a handgun in his waistband. CS-1 stated Vance also stores drugs at this residence and observed about 100 grams of heroin in the residence about two weeks earlier.

9.      CS-1 stated that when CS-1 would purchase heroin from Vance and MARSHALL, a girlfriend of MARSHALL's would arrive at the residence with the heroin. Vance would leave the residence with the money, meet with the unidentified girlfriend of MARSHALL, then return

6

to the residence with the heroin.  Despite CS-1's belief that MARSHALL and VANCE distribute heroin, all of the suspected "heroin" seized to date has tested positive for fentanyl rather than heroin.

*Controlled Purchases of Drugs from the Jonte MARSHALL DTO*

10.     On April 18, 2019, CS-1 placed a recorded and monitored call to Corey Vance. Vance answered the phone.  CS-1 asked Vance about purchasing "50" the following day and asked if the transaction could take place at 11:00 a.m. or 12:00 p.m.  Vance agreed and the call ended. Telephone records show that a short time later Vance called Jonte MARSHALL at (414) 779-1998.  Case agents believe Vance called MARSHALL to relay CS-1's request to purchase drugs.

11.     On April 19, 2019, CS-1 exchanged a series of text messages with Vance.  That morning, case agents established surveillance at the residence of Jonte MARSHALL, and at the residence of Corey Vance.  CS-1 was given $3,000 in pre-recorded buy money and an audio recording and monitoring device.  CS-1 received a text message from Vance which told CS-1 to come to Vance's residence to complete the transaction.  At about the same time, case agents observed Jonte MARSHALL walk from the rear of his residence.  MARSHALL entered the driver's seat of a black Cadillac Escalade and backed out of the driveway.  The vehicle was not followed.

12.     CS-1 arrived at Vance's residence and went inside.  A short time later, case agents observed MARSHALL's black Cadillac Escalade arrive and park near Vance's residence.  A few minutes later, Vance exited his residence and entered the front passenger seat of the Escalade.

7

Vance exited the Escalade about 20 seconds later and re-entered his residence. The Escalade then departed the area followed by several surveillance units.

13.    A short time later, CS-1 exited Vance's residence. CS-1 was followed directly to a pre-determined meet location. Upon arrival, CS-1 turned over to case agents a clear plastic, knotted baggie containing a tan, chunky substance suspected to be fentanyl. CS-1 stated that upon entering the residence, CS-1 met with Vance and handed the pre-recorded buy money to Vance. Vance placed a call and informed the person on the other end of the phone that CS-1 was "good." CS-1 waited in the residence for about 20 minutes with Vance. CS-1 further stated that at one point Vance received a text message and exited the residence. Less than a minute later, Vance returned to the residence and went into a back bedroom. A short time later, Vance returned to the living room and handed CS-1 the baggie containing the tan, chunky substance. Vance told CS-1 he had weighed the baggie and it weighed 50 grams. CS-1 then left the residence and returned to the predetermined meet location. The suspected fentanyl later tested positive for fentanyl with a total weight of 51.62 grams.

14.    Surveillance followed the Cadillac Escalade to a local BMO Harris Bank. MARSHALL exited the Escalade and entered the bank. Case agents later obtained surveillance video from the BMO Harris Bank branch. A review of the video showed MARSHALL enter the bank and meet with a bank teller. MARSHALL removed a large amount of United States currency from his pocket and deposited it into an unknown bank account.

15.    Case agents have made ten additional controlled purchases of fentanyl from members of the Jonte MARSHALL DTO. From May 8, 2019, through September 26, 2019, CS-1 purchased an additional 450 grams of fentanyl from Corey Vance and Jonte MARSHALL. MARSHALL was in regular phone contact with Vance surrounding each of these transactions.

8

During surveillance of several of the controlled buys, case agents observed Lemonda WARD deliver the fentanyl to Corey Vance prior to Vance delivering it to CS-1. Therefore case agents believe Lemonda WARD is a courier for the MARSHALL DTO. On October 11, 2019, Corey Vance died of natural causes. CS-1 attended a funeral service for Vance and met with Jonte MARSHALL. MARSHALL directed CS-1 to start purchasing fentanyl from Shomari HOOPER. CS-1 agreed.

16.　　In November 2019, CS-1 purchased approximately 50 grams of fentanyl from Shomari HOOPER at HOOPER's residence. In February 2020, CS-1 purchased approximately 50 grams of fentanyl from HOOPER at HOOPER's residence. In April 2020, CS-1 purchased approximately 100 grams of fentanyl from HOOPER at HOOPER's residence. Lemonda WARD delivered the fentanyl to HOOPER prior to HOOPER's transaction with CS-1. In June 2020, CS-1 purchased approximately 100 grams of fentanyl from HOOPER at HOOPER's residence. In November 2020, the CS purchased approximately 100 grams of fentanyl from HOOPER at HOOPER's residence. During the controlled buy, the CS observed approximately 300 grams of fentanyl in HOOPER's residence along with blenders commonly used to prepare fentanyl for distribution.

17.　　Telephone records have revealed that during many of these transactions, data sessions had been opened on MARSHALL's, HOOPER's, and/or WARD's phone. Case agents are aware that data sessions are opened when the user of a cellular phone is utilizing the cellular network to send or receive data, including communications sent using alternate communication platforms. There have been numerous instances of physical and electronic surveillance when Jonte MARSHALL, Shomari HOOPER, and Lemonda WARD have been observed meeting with each other and/or other suspected members of the MARSHALL DTO, but there has not been a phone

call preceding these meetings. Case agents believe that MARSHALL, HOOPER, and WARD are using a communication platform to communicate with each other and with other DTO members. Case agents are further aware that Apple FaceTime is a communication platform frequently used by drug traffickers to communicate with each other and that the use of Apple FaceTime would cause a data session to be utilized on the user's cellular phone.

18.     On September 30, 2019, a Grand Jury subpoena was served on Apple for information related to (414) 779-1998, the cellular phone used by Jonte MARSHALL. On October 10, 2019, case agents received a response from Apple. The response identified the Apple ID associated with (414) 779-1998 as **idtr_black@yahoo.com**. The Apple response further identified Jonte MARSHALL's email address as **idtr_black@yahoo.com**.

19.     On March 20, 2020, a United States Postal Inspector was conducting routine parcel screening at the United States Postal Service ("USPS") Root River Post Office, located at 11015 W Oklahoma Avenue, Milwaukee, Wisconsin 53227, when the following parcel was found to be suspicious in nature: USPS Priority Mail parcel 9405503699300286995365. The parcel was approximately an 11.25" x 8.75" x 6" USPS medium flat rate Priority Mail parcel weighing approximately 5 lbs. 8 oz. The parcel's label indicated it was from "The Variety Shoppe, PO Box 315, Dawsonville GA 30534-0006." The parcel bore a typewritten label addressed to "Jonte Marshall, 1929 S 97th St, West Allis WI 53227-1430." The parcel was postmarked on March 18, 2020, in Dawsonville, Georgia 30534. The postage paid was $15.05.

20.     The sender of the parcel, The Variety Shoppe, has a website, www.varietyshoppe.com, showing a number of products they sell including digital scales, detox products, sexual stimulants, room deodorizers, and "powdered vitamins." Their homepage shows the "top selling powdered vitamin supplements" as mannitol, inositol, niacinamide, lactose, and

VitaBlend. Case agents are aware mannitol, inositol, and lactose are common cutting agents added to narcotics prior to distribution. The website further states, "***our customers receive an e-mail after the order is shipped containing an estimated time of arrival and a tracking number for the order***."

21. A check of USPS business records showed that since June 2018 the destination address of the parcel, 1929 South 97th Street, has received at least 35 packages originating from The Variety Shoppe. At least ten of these packages have all been from the same sender address as the parcel sent on March 18, 2020, and have all shown the same approximate weight as this parcel. The USPS business records were not kept for approximately 20 of the initial parcels. Postal Inspectors were unable to confirm the sender name and address of these parcels, but suspect they all originated from The Variety Shoppe due to the type of USPS shipment used, the originating Post Office, and the weight of the parcels being the same as this parcel.

22. On March 20, 2020, case agents applied for and received a federal sneak and peek search warrant for the parcel. The search warrant was issued by United States Magistrate Judge Nancy Joseph in the Eastern District of Wisconsin. Upon executing the search warrant on the parcel on March 20, 2020, case agents discovered the parcel contained two containers of Seven Stars Superior Lactose in powder form. The label for each container showed they each contained "2.2 lbs/1000 grams" of lactose. The parcel also contained a packing slip which showed the order was taken by The Variety Shoppe from Jonte MARSHALL with an email address of **ldtr_black@yahoo.com.**[3] Case agents repackaged the parcel with all of its original contents and placed it back into the mail stream. The parcel was delivered on March 21, 2020, at approximately 10:41 a.m.

---

[3] Case agents believe this particular order contained a typo of MARSHALL's actual email address where the first letter, "i" was changed to an "l."

23.     On June 11, 2020, a United States Postal Inspector was reviewing United States Postal Service ("USPS") business records when a Priority Mail parcel was found to be suspicious.  The postal records indicated that a parcel had been shipped to "Jon Marshall" at 1929 South 97th Street, West Allis, Wisconsin.  The Postal Inspector examined the USPS business records and open-source website information and determined that the parcel had been shipped from a company named "Kief Presses."  A review of the website for Kief Presses, http://www.kiefpresses.com, revealed that the company manufactured and sold four different presses, which the company described as "pollen" presses.  I am aware, based on my training and experience, that presses of this type are commonly used to compress powdered narcotics, such as fentanyl, heroin, and cocaine, into compressed "bricks" after they have been diluted with cutting agents.

24.     A review of postal records revealed that the parcel shipped to Jonte MARSHALL from Kief Presses was being tracked from Jonte MARSHALL's residence at 8320 West Mourning Dove Court, Mequon, Wisconsin. An Administrative Subpoena previously served on Charter Communications revealed that the internet service at that residence was subscribed to Jonte MARSHALL with an email address of **idtr_black@yahoo.com**.  That same day, MARSHALL was also due to receive another parcel from The Variety Shoppe, which case agents believe, based on the investigation to date, contained more lactose.  That package had also been shipped to 1929 South 97th Street, West Allis, Wisconsin.  Both parcels were delivered on Friday, June 12, 2020.  Case agents believe that MARSHALL had purchased a press and additional quantities of a cutting agent in order to manufacture additional quantities of fentanyl, heroin, and/or cocaine, and to press those powders into "brick" form.

12

25.     On June 19, 2020, the Honorable Stephen C. Dries, United States Magistrate Judge in the Eastern District of Wisconsin, signed a warrant for information associated with the email address **idtr_black@yahoo.com** that was in possession of Yahoo!.  On June 30, 2020, case agents received a response from Yahoo!.  The response contained over 20,000 emails sent or received by MARSHALL from January 1, 2019, through June 19, 2020.

26.     Several of the emails revealed tracking updates from FedEx for parcels being sent from "John marshall, Blackout Investments LLC" on March 2, 2020; April 16, 2020; and May 19, 2020.  Case agents are aware that Jonte MARSHALL is the registered agent for Blackout Investments LLC and that he frequently refers to himself as "John" in numerous emails.  The March 2, 2020, parcel was sent to "Oscar Ramirez" at a FedEx Ship Center in Los Angeles, California.  Case agents have identified Oscar RAMIREZ-RIVERA as a source of supply to the MARSHALL DTO.  The parcel was delivered on March 3, 2020, and was signed for by "O. Ramirez."  The April 16, 2020, parcel was sent to Luis MATA-TORRES at 10620 W. Illini St, Tolleson, Arizona.  A review of public databases and social media information revealed that Oscar RAMIREZ-RIVERA shares several addresses and appears to be romantically involved with Mirna MATA.  Public databases and social media information indicate that Mirna MATA has a brother named Luis MATA-TORRES.   This parcel was delivered on April 17, 2020.  The May 19, 2020, parcel was also addressed to Luis MATA-TORRES at 10620 W. Illini St, Tolleson, Arizona.  This parcel was delivered on May 20, 2020.  Case agents believe these parcels contained payment to Oscar RAMIREZ-RIVERA for drugs previously received by MARSHALL.

27.     On June 17, 2020, case agents sent an Administrative Subpoena to FedEx Express for information on parcels sent using the FedEx account of "John marshall, Blackout Investments LLC."  On July 7, 2020, case agents received records from FedEx.  The records confirmed the

Case 2:22-mj-00575-SCD   Filed 10/21/22   Page 19 of 45   Document 1

three parcels described above. The records also indicated seven additional parcels had been sent to Luis MATA-TORRES and one parcel had been sent to Cindi MATA. All the parcels were delivered to addresses known to be associated with Mirna MATA and/or Oscar RAMIREZ-RIVERA or addresses that Oscar RAMIREZ-RIVERA had provided to Jonte MARSHALL via iMessage.

28.     On July 20, 2020, the Honorable Nancy Joseph, United States Magistrate Judge in the Eastern District of Wisconsin, signed warrants authorizing the search of (414) 779-1998 and (602) 703-0618. More specifically, the warrants directed AT&T and T-Mobile to provide information about the location of (414) 779-1998 and (602) 703-0618 for a period of 45 days.

29.     Case agents monitoring the location of (602) 703-0618 observed that RAMIREZ-RIVERA had been primarily in the Phoenix, Arizona area until July 31, 2020. On July 31, 2020, RAMIREZ-RIVERA travelled from Phoenix to Los Angeles, California. From July 31, 2020, until August 5, 2020, RAMIREZ-RIVERA remained in California and frequented the areas of Palmdale, California; Llano, California; and San Bernardino, California. On August 5, 2020, RAMIREZ-RIVERA returned to the Phoenix area. On Thursday, August 6, 2020, at 10:20 p.m., court-authorized positional information for (602) 703-0618 indicated that RAMIREZ-RIVERA was at the airport in Milwaukee, Wisconsin. RAMIREZ-RIVERA remained in the Milwaukee area and his phone was frequently observed at the same locations as MARSHALL's cellular phone.

30.     On August 12, 2020, at 8:50 a.m., court-authorized positional information for (602) 703-0618 indicated that RAMIREZ-RIVERA's cellular phone was in close proximity to 7836 North Faulkner Road, Milwaukee, Wisconsin. This is the location of Schweiger and Baumann Trucking LLC, a business owned by Jonte MARSHALL. At 9:01 a.m., court-authorized positional information for (414) 779-1998, MARSHALL's cellular phone, indicated MARSHALL was also

in that area. At 9:20 a.m. and 9:35 a.m., (602) 703-0618 was located in close proximity to MARSHALL's residence at 8320 West Mourning Dove Court, Mequon, Wisconsin. At 9:18 a.m. and 9:36 a.m., (414) 779-1998 remained near 7836 North Faulkner Road. At 9:50 a.m., (602) 703-0618 was again in the area of 7836 North Faulkner Road. At 10:05 a.m., (602) 703-0618 was located in the area of North 76th Street and West Brown Deer Road which is between MARSHALL's residence and 7836 North Faulkner Road. At 10:07 a.m., (414) 779-1998 was located near MARSHALL's residence. At 10:20 a.m., (602) 703-0618 was located near North 76th Street and West Bradley Road which is approximately 13 blocks east of 7836 North Faulkner Road.

31. At 10:25 a.m., case agents began to conduct surveillance at 7836 North Faulkner Road, Milwaukee, Wisconsin. At 10:25 a.m., case agents observed Jonte MARSHALL's black 2018 Cadillac Escalade, bearing Wisconsin license plates AGE-4015, parked in the southeast corner of the rear parking lot at that location. These license plates list to Blackout Investments LLC at 7836 North Faulkner Road, Milwaukee, Wisconsin. Jonte MARSHALL is the registered agent for Blackout Investments LLC. Case agents also observed Jonte MARSHALL standing in the rear parking lot at that location. MARSHALL appeared to be taking a picture of a vehicle in a rear parking area. The vehicle could not be seen as it was parked between other large vehicles. Court-authorized positional information also confirmed that (414) 779-1998 was at that location at 10:25 a.m. Case agents established surveillance where they could observe vehicles coming and going from the business, but could not observe most of the rear parking lot.

32. At 10:35 a.m., court-authorized positional information for (602) 703-0618 indicated it was located near 7836 North Faulkner Road. At 10:39 a.m., case agents observed a gray 2016 Jeep Grand Cherokee, bearing California license plates 8ADB961, drive from the rear

parking lot and turn south on North Faulkner Road. These license plates list to Carlos ESTRADA at 13841 Beech Street, Victorville, California 92392. This vehicle was not followed. At 10:41 a.m., (414) 779-1998 was still located near 7836 North Faulkner Road. At 10:48 a.m., case agents observed Jonte MARSHALL walk across the rear parking lot and enter the driver's seat of his Cadillac Escalade. MARSHALL drove the Escalade out of the parking lot and turned north on North Faulkner Road. Case agents attempted to locate MARSHALL's vehicle, but were unsuccessful.

33.     At 10:49 a.m., court-authorized positional information for (602) 703-0618 indicated it was located near 7300 West Good Hope Road, Milwaukee, Wisconsin. Case agents went to that location in an attempt to locate RAMIREZ-RIVERA. At 10:58 a.m., case agents observed a commercial car carrier in the parking lot at approximately 7208 North 76th Street, Milwaukee, Wisconsin. Case agents observed a gray Jeep Grand Cherokee on the upper cargo area of the car carrier and confirmed that the license plate on the Jeep was the same license plate of the Jeep observed leaving 7836 North Faulkner Road. Case agents were unable to locate RAMIREZ-RIVERA at that location and then began to conduct surveillance of the car carrier and Jeep.

34.     Case agents maintained surveillance of the car carrier until it entered Interstate 94 eastbound toward Chicago, Illinois. The car carrier was followed into Racine County, Wisconsin. At 12:34 p.m., a Wisconsin State Patrol Inspector conducted a traffic stop of the car carrier for a safety inspection. After the initial traffic stop, the car carrier was relocated to the Racine Safety Weight Enforcement Facility for an inspection. The driver of the car carrier stated he had picked up all three of the vehicles on the car carrier from private parties in the Milwaukee area. The driver had shipping information on his phone which indicated the Jeep Grand Cherokee was being

16

transported to Hesperia, California. The Inspector asked the driver to off-load the Jeep and one other vehicle so he could confirm the VIN numbers on each vehicle. The driver agreed to do so. A Wisconsin State Patrol Trooper then arrived on scene to assist the Inspector. The Trooper deployed his K-9 partner around the Jeep and the other vehicle and the K-9 alerted to the odor of controlled substances emanating from the Jeep. During a search of the Jeep, the Inspector and Trooper located an electronically-controlled compartment behind the rear passenger seat. The compartment was observed to contain rubber-banded United States currency. The Inspector and Trooper dismantled the compartment and removed a large amount of United States currency. An official count later revealed that $508,140 in United States currency was located in the compartment.

35. On August 12, 2020, the DEA Detroit Field Division contacted Milwaukee case agents regarding a telephone deconfliction. The Detroit agents had received information from a source of information (SOI) related to the seizure of the currency from the Jeep Cherokee in Wisconsin and a possible future shipment of currency from Milwaukee. The SOI provided Detroit agents with specific information that Jonte MARSHALL and Oscar RAMIREZ-RIVERA planned to ship a second vehicle from Milwaukee on August 13, 2020. The SOI provided agents with the vehicle pickup location and a description of the vehicle.

36. On August 13, 2020, Milwaukee case agents established surveillance at the vehicle pickup location, the same business owned by MARSHALL, located at 7836 North Faulkner Road, Milwaukee, Wisconsin. At 8:36 a.m., case agents observed a white Ford Expedition parked in the rear of the building. At 12:39 p.m., case agents observed the black Cadillac Escalade, bearing Wisconsin license plate AGE-3015, driven by MARSHALL, arrive at the business and park in the rear. At 12:41 p.m., court-authorized positional information for (414) 779-1998 revealed that the

phone was in close proximity to 7836 North Faulkner Road, Milwaukee, Wisconsin. At 12:46 p.m., MARSHALL left the business northbound in the black Escalade. At 2:17 p.m., case agents observed a grey GMC Acadia, bearing Minnesota license plates DGA140, driven by a Hispanic male later identified as RAMIREZ-RIVERA arrive at the business and park in the rear. These license plates list to PV Holding Corporation, 2240 Airport Lane, Minneapolis, Minnesota 55450. PV Holding Corporation is a holding company for Avis and Budget rental cars. At 2:19 p.m., court-authorized positional information for (602) 703-0618 revealed that the phone was in close proximity to 7836 North Faulkner Road, Milwaukee, Wisconsin.

37.     At 5:41 p.m., case agents observed a commercial car carrier arrive at the business and park in front on North Faulkner Road. The company name "Gigi Line" was printed on the side of the truck. Shortly thereafter, RAMIREZ-RIVERA drove a white 2005 Ford Expedition, bearing Wisconsin license plates AFH-7134, from the rear of the business and turned the vehicle over to the driver of the car carrier. These license plates list to Jonte MARSHALL at 1929 South 97th Street, West Allis, Wisconsin. This vehicle matched the description of the vehicle previously provided by the Detroit SOI. The driver loaded the Ford Expedition onto the car carrier while RAMIREZ-RIVERA watched.

38.     Agents conducted surveillance of the car carrier for approximately three hours as it picked up additional cars in West Bend, Wisconsin. After leaving that area, case agents followed the car carrier until it entered Interstate 94 toward Chicago, Illinois. At 9:43 p.m., as the car carrier was in Racine, County, Wisconsin, a traffic stop was conducted by the Wisconsin State Patrol. During the traffic stop and inspection, a Racine County Sheriff Deputy deployed his K-9, which gave a positive alert to the odor of controlled substances in the Ford Expedition. During a search of the vehicle, case agents located a large amount of US Currency concealed in a natural void in

18

the driver's side rear quarter panel. An official count later determined that $100,020 had been seized from the vehicle.

39.     On September 21, 2020, the Honorable Stephen C. Dries, United States Magistrate Judge in the Eastern District of Wisconsin, signed a warrant for information associated with the email address **idtr_black@yahoo.com** that was in possession of Yahoo!. On October 7, 2020, case agents received a response from Yahoo!. The response contained over 10,000 emails sent or received by MARSHALL from June 19, 2020, through September 21, 2020.

40.     A review of emails sent to and from **idtr_black@yahoo.com** revealed that Jonte MARSHALL continued to utilize this email address to further the drug trafficking and money laundering activities of the MARSHALL DTO. For example, on June 20, 2020, an email was sent from eBay (ebay@ebay.com) to **idtr_black@yahoo.com** that confirmed delivery of "1 Kilogram – Top Grade Superior Lactose Powder." As detailed above, case agents believe that the MARSHALL DTO utilizes lactose as a cutting agent for fentanyl.

41.     On December 21, 2020, a search warrant was executed at 326 West Florida Street #403, Milwaukee, Wisconsin. The target of this warrant was Jovan NEWMAN. Case agents are aware, based on the investigation to date, that Jovan NEWMAN is a rapper who uses the stage name of Looney Baby. Jovan NEWMAN's brother, Barry NEWMAN, is also a rapper who uses the stage name Gwapo Chapo. Jovan NEWMAN and Barry NEWMAN have signed contracts with Blackout Entertainment MKE. The investigation to date has revealed that Jonte MARSHALL operates Blackout Entertainment MKE.

42.     During the execution of the search warrant, Jovan NEWMAN was located in the residence and was taken into custody. A search of the residence revealed 131.90 grams of fentanyl, 18.20 grams of marijuana, five firearms, including a full-automatic Glock handgun, $56,719 in

United States currency, and assorted jewelry. Case agents also located numerous bottles of Seven Stars Superior Lactose in powder form, the same brand of lactose purchased from The Variety Shoppe by Jonte MARSHALL, and a large metal press within the residence. As described above, lactose is a common cutting agent used to prepare controlled substances for distribution and presses of the kind located at the residence are commonly used to compress controlled substances into hardened shapes prior to distribution. Additionally, a United States Postal Service box was located in the bedroom. This box held several additional bottles of Seven Stars Superior Lactose in powder form. The address label on this box showed that it had been shipped The Variety Shoppe in Henderson, Nevada[4] to Christopher HILL in Milwaukee, Wisconsin. Christopher HILL is known to be a DJ who is used to promote the rap songs of Jovan NEWMAN and Barry NEWMAN. Telephone records reveal that MARSHALL, using (414) 779-1998 is in regular and frequent phone contact with Christophe HILL and Jovan NEWMAN. Case agents believe that Jovan NEWMAN and Christopher HILL assist with the manufacture and distribution of fentanyl for the MARSHALL DTO.

43.     On June 2, 2020, the Honorable Stephen C. Dries, United States Magistrate Judge in the Eastern District of Wisconsin, signed a warrant for information associated with the email address **idtr_black@yahoo.com** that was in possession of Oath Holdings. On June 17, case agents received a response from Oath Holdings. The response contained over 27,000 emails sent or received by MARSHALL from September 22, 2020, until the morning of June 2, 2021. A review of these emails shows that Jonte MARSHALL continues to send and receive emails using email address **idtr_black@yahoo.com** in furtherance of the drug trafficking and money laundering activities of the MARSHALL DTO.

---

[4] Case agents believe that at some point during 2020, The Variety Shoppe moved from Dawsonville, Georgia to Henderson, Nevada.

20

44.     For example, on March 19, 2021, at 7:01 p.m., an email was sent from chuckneil45@gmail.com to **idtr_black@yahoo.com**.   The email had no content, but the attachment consisted of the Criminal Complaint and Affidavit dated March 16, 2021, in the Eastern District of Wisconsin, which charged Dwight Clayton and Jeffrey Coleman with Conspiracy to Distribute 5 kilograms or more of Cocaine.   MARSHALL, using **idtr_black@yahoo.com**, subsequently forwarded the complaint to romainejackson374@gmail.com.   Case agents believe MARSHALL is using **idtr_black@yahoo.com** to communicate with others regarding rival drug traffickers in the Milwaukee area.

45.     Similarly, on March 20, 2021, at 9:24 a.m., MARSHALL, using **idtr_black@yahoo.com**, sent an email to chuckneil45@gmail.com.  This email contained a link to www.forfeiture.gov, the website which lists notifications of pending federal forfeiture.   An attachment to the email consisted of the Drug Enforcement Administration's Match 20, 2021 Official Notification of forfeitures.  The Notification included United States currency and jewelry seized from Jovan NEWMAN on December 21, 2021, as detailed above.  Case agents believe MARSHALL is utilizing the email address **idtr_black@yahoo.com** to communicate with others regarding the drug trafficking and money laundering activities of members of the MARSHALL DTO.

46.     On June 13, 2021, at 10:27 p.m., a Kansas Highway Patrol Trooper was monitoring traffic on US Highway 54 in Seward County, Kansas.  The Trooper observed a 2022 Kenworth Semi Tractor, bearing Illinois license plate P1048444, towing a 2020 Sun Valley Car Carrier trailer, bearing Illinois license plate 717079ST, eastbound on US Highway 54.  The Trooper conducted a traffic stop of the car hauler for a commercial vehicle inspection.  Upon inspecting the vehicles on the car carrier, the Trooper located a white 2013 Nissan Cube that had been shipped

from California and was destined for Milwaukee, Wisconsin. A subsequent search of the Nissan Cube revealed electronically controlled compartments beneath both of the vehicle's front floorboards. These compartments were found to contain 16 kilogram-shaped packages of a substance that tested positive for fentanyl and 14 packages of a substance that tested positive for cocaine. Case agents believe this fentanyl and cocaine were being transported to Milwaukee, Wisconsin to be distributed in the Eastern District of Wisconsin. Case agents removed the narcotics from the vehicle and arranged for the vehicle to be transported to Wisconsin.

47. On June 14, 2021, the Honorable Nancy Joseph, United States Magistrate Judge in the Eastern District of Wisconsin, signed a search warrant authorizing the search of the AT&T cellular phone assigned phone number (213) 379-2357. This phone had been utilized to arrange the shipment of the Nissan Cube. On June 16, 2021, at 7:45 a.m., court-authorized positional information for (213) 379-2357 showed that the phone was in close proximity to The Chalet Motel of Mequon at 10401 North Port Washington Road, Mequon, Wisconsin. Case agents responded to that location and observed a black 2016 Nissan Juke, bearing California license plates 8ROZ059.

48. On June 16, 2021, case agents met with the driver of the commercial car carrier in the Eastern District of Wisconsin. The concealed compartments in the Nissan Cube were filled with facsimile kilogram-shaped packages similar to those seized in Kansas. The Nissan Cube was equipped with tracking devices and an alarm which would alert case agents when the concealed compartments were opened. Case agents then conducted a controlled delivery of the Nissan Cube to its delivery destination.

49. After the car carrier arrived at the delivery location, the driver contacted (213) 379-2357 via text message and advised that the vehicle had arrived. The user of (213) 379-2357 stated

his "friend" would arrive shortly. Case agents observed three Hispanic males walk across the Chalet Motel parking lot and enter the Nissan Juke. These subjects were later identified as Daniel RODRIGUEZ-LARA, Richard CHAVEZ, and Humberto CORONEL-VEGA. The Nissan Juke, driven by CHAVEZ, was followed from the motel and eventually arrived at the delivery location. Daniel RODRIGUEZ-LARA exited the Nissan Juke and received the Nissan Cube from the truck driver. RODRIGUEZ-LARA drove to a nearby Walmart and parked the Cube in the parking lot. He then entered the Nissan Juke and the vehicle drove out of the area.

50.     Case agents maintained surveillance of the Nissan Juke, CHAVEZ, RODRIGUEZ-LARA, and CORONEL-VEGA, for approximately six hours at which time case agents lost sight of the vehicle and surveillance was terminated. Case agents maintained constant visual surveillance of the Nissan Cube and no one returned to the vehicle. On June 16, 2021, at approximately 10:15 p.m., case agents maintaining surveillance of the Nissan Cube at Walmart observed a Yellow Cab taxi pull into the parking lot and stop near the Cube. RODRIGUEZ-LARA exited the taxi and entered the driver's seat of the Cube. Case agents followed the Cube to Rick's Car Care, 6121 West Mequon Road, Mequon, Wisconsin. RODRIGUEZ-LARA parked the vehicle in the parking lot and re-entered the same taxi, which had also arrived at the location. The taxi was followed to the Days Inn & Suites, 1840 North 6th Street, Milwaukee, Wisconsin. RODRIGUEZ-LARA exited the taxi and entered the hotel. Approximately 10 minutes later, RODRIGUEZ-LARA exited the hotel with CORONEL-VEGA. They walked around the neighborhood for approximately 15 minutes before returning to the hotel. Surveillance video later showed RODRIGUEZ-LARA and CORONEL-VEGA depart the hotel on June 17, 2021, at 12:12 a.m.

51.     At approximately 12:50 a.m., case agents observed a 2006 Range Rover, bearing California license plates 6NNH477, enter the parking lot of Rick's Car Care.  Case agents observed two subjects enter the Nissan Cube and drive the vehicle out of the area.  The vehicle was followed to North River Road south of Mequon Road where it pulled to the side of the road.  Case agents received an alert that the concealed compartments inside the Cube had been opened.  Case agents attempted to conduct a traffic stop of the Cube at which time the vehicle struck a law enforcement vehicle and fled at a high rate of speed. Eventually, the Cube crashed at the intersection of West County Line Road and North Wakefield Court, Bayside, Wisconsin.  Both occupants of the vehicle fled and evaded capture.  Case agents believe, based on the investigation to date, that CORONEL-VEGA was the driver of the Cube and Daniel RODRIGUEZ-LARA was the front passenger.  A search of the vehicle revealed a pillow case on the floor of the backseat which contained 14 of the facsimile kilogram-shaped packages that were previously hidden in the concealed compartment underneath the front passenger seat.  Case agents subsequently arrested Richard CHAVEZ and Daniel RODRIGUEZ-LARA.   The Nissan Juke driven by CHAVEZ was later located and concealed compartments were located beneath both of the front floorboards.

52.     On June 17, 2021, Daniel RODRIGUEZ-LARA and Richard CHAVEZ were charged by criminal complaint in the Eastern District of Wisconsin with Conspiracy to Distribute Controlled Substances and Attempted Possession with the Intent to Distribute 5 kilograms of cocaine and 5 kilograms of fentanyl.  On June 22. 2021, a Grand Jury in the Eastern District of Wisconsin returned a true bill charging RODRIGUEZ-LARA and CHAVEZ with Conspiracy to Distribute Controlled Substances and Attempted Possession with the Intent to Distribute 5 kilograms or more of cocaine and 400 grams or more of fentanyl.  CORONEL-VEGA continues to be sought.

24

53.     On June 29, 2021, case agents interviewed Richard CHAVEZ pursuant to a proffer letter. CHAVEZ stated that he was involved in the shipment of the Nissan Cube from California to Wisconsin. CHAVEZ further stated that RODRIGUEZ-LARA and CORONEL-VEGA also travelled from California to Wisconsin to assist in the delivery of the Nissan Cube. CHAVEZ stated the fentanyl and cocaine in the vehicle were destined for a subject CHAVEZ knows as "Jon" who lives in Mequon, Wisconsin. CHAVEZ described "Jon" as an African-American male 45-50 years old. CHAVEZ identified a photo of Jonte MARSHALL as the subject CHAVEZ knows as "Jon." CHAVEZ also described the location of MARSHALL's residence and pointed out the location on a map. The location identified by CHAVEZ was 8320 West Mourning Dove Court, Mequon, Wisconsin. Case agents are aware this is the residence of Jonte MARSHALL. CHAVEZ stated that within the last year he had arranged the delivery of over 100 kilograms of fentanyl from California to Jonte MARSHALL in Wisconsin. CHAVEZ further stated that MARSHALL had shipped in excess of $3,000,000 in bulk United States currency from Wisconsin to California in the last year as payment for fentanyl received by the MARSHALL DTO.

54.     CHAVEZ also provided case agents with the phone number used by MARSHALL to coordinate the delivery of the fentanyl and cocaine seized in Kansas. Court-authorized positional information for that phone showed the phone travelled in tandem with the known phone used by MARSHALL for several days surrounding the expected delivery of the fentanyl and cocaine. Case agents believe this indicates that MARSHALL was carrying the phone during that time period. Case agents believe this further corroborates CHAVEZ's statement that Jonte MARSHALL was the intended recipient of the fentanyl and cocaine. CHAVEZ further identified Jose AISPURO-NIEBLA and Juan AISPURO-NIEBLA as the subjects responsible for arranging

prior shipments of fentanyl to MARSHALL and for arranging the shipment of fentanyl and cocaine which was seized in Kansas.

55.     CHAVEZ also told case agents that MARSHALL had also purchased a black Nissan Juke and arranged for that vehicle to be shipped to California.  While the vehicle was in California, concealed compartments were installed beneath both of the front floorboards in a similar fashion to those installed in the vehicle seized from CHAVEZ, as described above.  The Nissan Juke purchased by MARSHALL was then sent back to MARSHALL in Wisconsin.

56.     A review of emails from the June 2, 2021, search warrant revealed that on February 15, 2021, at 11:43 a.m., MARSHALL, using **idtr_black@yahoo.com** received an email from service@service.nissanusa.com.  This email address belongs to Zeigler Nissan of Gurnee, located at 3175 East Grand Avenue, Lindenhurst, Illinois 60046.  The Subject Line of this email read, "Buy 3 tires for your Juke and get one for $1."  Case agents believe this email was sent to MARSHALL because at some point MARSHALL had purchased a Nissan Juke from Zeigler Nissan.  A search of law enforcement database records showed that on January 27, 2021, Jonte MARSHALL registered a black 2015 Nissan Juke which was assigned Wisconsin license plates AGB-9268.  Historical registration records showed the vehicle had previously been registered in Fox Lake, Illinois which is located near Gurnee, Illinois.  Case agents believe the vehicle had been acquired by Zeigler Nissan of Gurnee and sold to MARSHALL who then registered it in Wisconsin.  On February 1, 2021, MARSHALL, using **idtr_black@yahoo.com** received an email from UPS indicating that a package from Zeigler Nissan of Gurnee had been delivered to his residence at 1929 South 97th Street, West Allis, Wisconsin 53227.  Case agents believe this package contained documents related to MARSHALL's purchase of the Nissan Juke.

57.     A further examination of the emails received pursuant to the June 2, 2021, search warrant revealed that on January 7, 2021, at 5:14 p.m., Marshall, using **idtr_black@yahoo.com** received an email from info@advancedcarshipping.com, the email address for Advanced Car Shipping.  The email was directed to "Jon Davis" which case agents believe is a nominee name used by MARSHALL.  The email provided a quote for shipping a 2015 Nissan Juke from Zip Code 60046, the Zip Code in Lindenhurst, Illinois, to Palm Desert, California 92211.  Palm Desert, California is east of the San Bernardino area of California and very close to Desert Hot Springs, California, the home of Humberto CORONEL-VEGA.  Case agents believe MARSHALL explored the cost to ship a Nissan Juke from Zeigler Nissan of Gurnee to DTO members in California prior to purchasing the vehicle.  Case agents believe this is the vehicle which Richard CHAVEZ stated was purchased by MARSHALL and then shipped to California to have concealed compartments installed in it.

58.     On May 8, 2021, at 2:17 p.m., MARSHALL, using **idtr_black@yahoo.com** received an email from Amazon.com which confirmed the successful update of an Amazon.com order.  The email showed that MARSHALL had ordered thee 1-kilogram packages of "Pure Lactose Powder" for $39.99 each.  This order was due to be delivered to "Jonte, West Allis" between May 14, 2021 and May 18, 2021.  At 2:21 p.m., MARSHALL, using **idtr_black@yahoo.com** received an email from service@modernistpantry.com, the email address of Modernist Pantry.  The email confirmed MARSHALL's order of four 1-kilogram packages of Lactose Powder.  This order was due to be delivered to Jonte MARSHALL, 1929 South 97th Street, West Allis, Wisconsin and listed MARSHALL's phone number as (414) 779-1998.  A search of United States Postal Records showed that the package from The Modernist Pantry was delivered on March 13, 2021.  On May 12, 2021, MARSHALL, using **idtr_black@yahoo.com** received an

27

email from Amazon.com indicating his package containing the three kilograms of lactose would be delivered on May 18, 2021. Case agents believe these were two separate purchases of lactose as the Modernist Pantry order was paid for via PayPal and Amazon.com purchases are generally paid for via Amazon.com. As detailed above, case agents believe that MARSHALL DTO members utilize lactose as a cutting agent for fentanyl. In this instance, Jonte MARSHALL purchased seven kilograms of lactose in a one-week period.

59.     MARSHALL, using **idtr_black@yahoo.com**, has received numerous emails from alerts@notify.wellsfargo.com which detailed transactions at Wells Fargo Bank. For example, on July 15, 2021, at 12:54 p.m., MARSHALL received an email from Wells Fargo Bank which documented a deposit of $7,000.00 in United States currency, all $20 bills, to an account ending in "2899." On July 16, 2021, at 1:39 p.m., MARSHALL received an email from Wells Fargo Bank which documented a deposit of $6,000.00 in United States currency, including $5,640.00 in $20 bills, to the account ending in "2899." On July 20, 2021, at 11:53 a.m., MARSHALL received an email from Wells Fargo Bank which documented a deposit of $8,000.00 in United States currency, all $20 bills, and one check in the amount of $1,000.00. The deposit was also made to the account ending in "2899." On July 24, 2021, MARSHALL received an email from Wells Fargo Bank which documented a deposit of $4,000.00 in United States currency, including $2,000 worth of $20 bills and $2,000 worth of $10 bills. These four deposits, over the course of approximately 10 days, total $25,000, the vast majority of which was composed of small denomination bills. Case agents are aware that drug transactions frequently involve small denomination bills being used for purchases of narcotics. Additionally, case agents believe the fact that the multiple cash deposits under $10,000 over the course of 10 days may have been

28

conducted to evade requirements of Wells Fargo Bank to report currency transactions over $10,000 in compliance with the Bank Secrecy Act.

60.     On July 12, 2021, MARSHALL, using **idtr_black@yahoo.com**, received an email from do_not_reply@psc.uscourts.gov, an account associated with Public Access to Court Electronic Records (PACER) of the United States Courts.  Case agents are aware that PACER can be used to access case information regarding cases filed in the United States Federal Courts.  The email listed the Account Contact name as Jonte MARSHALL and indicated that the usage for the account was less than $30 for the quarterly billing cycle so the resulting fees would be waived. Case agents find the fact that MARSHALL maintains a PACER account when he is not involved in Federal Court cases suspicious and believe that MARSHALL maintains this account in order to monitor the criminal cases of co-conspirators and others in the Milwaukee area who have Federal criminal cases pending.

61.     Case agents have utilized the court-authorized positional information for (414) 779-1998, MARSHALL's cellular phone, to assist with physical surveillance of MARSHALL.   On July 22, 2022, at 1:01 p.m., court-authorized positional information indicated the phone was in close proximity to North Mayfair Road and West North Avenue, Wauwatosa, Wisconsin.   A case agent responded to that area in an attempt to locate Jonte MARSHALL.   At 1:31 p.m., the case agent located MARSHALL's white 2021 Cadillac Escalade, bearing Wisconsin license plate AND-5667, parked in the parking lot of Best Buy, 2401 North Mayfair Road, Wauwatosa, Wisconsin. These license plates list to Schweiger and Baumann and Jonte MARSHALL.   The case agent established surveillance of the vehicle.

62.     At 1:49 p.m., the case agent observed Jonte MARSHALL walk from the entrance of Best Buy toward the Escalade.   MARSHALL was accompanied by two Hispanic males.

MARSHALL entered the driver's seat and the two males entered the front and rear seats on the passenger side.  MARSHALL drove the vehicle out of the parking lot and drove across the street into the parking lot of Mayfair Mall.  The case agent temporarily lost sight of the vehicle at 1:54 p.m.  At 1:59 p.m., the case agent located the Escalade driving east in a parking aisle just south of the Tokyo Hut restaurant.  The Escalade then drove north in the parking lot and parked near a mall entrance just north of Potbelly Sandwich Shop.  The case agent again lost sight of the vehicle temporarily.  When visual surveillance was re-established, the vehicle was unoccupied.

63.     On August 18, 2022, the case agent obtained surveillance video from Best Buy from July 22, 2022.  The video shows MARSHALL and the two Hispanic males enter the store at 12:43 p.m.  MARSHALL and the two males did no actual shopping while inside the store.  They walked to an area of the store where they had conversation for several minutes.  One of the Hispanic males appeared to be translating for the other.  Whenever a customer or Best Buy employee came near MARSHALL and the males, they would relocate to a different part of the store and continue their conversation.  This happened several times for approximately one hour.  Case agents believe, based on the investigation to date and several nonverbal indicators observed on the surveillance video, that MARSHALL and the males were involved in a negotiation.  Case agents believe this negotiation involved the drug trafficking and money laundering activities of the MARSHALL DTO.  MARSHALL and the males left the store at 1:48 p.m. and were observed driving back to the Mayfair Mall parking lot in MARSHALL's Cadillac.  On September 15, 2022, case agents showed still photos from the Best Buy surveillance video to Richard CHAVEZ.  CHAVEZ positively identified the male in the blue shirt as Jose AISPURO-NIEBLA.  The cooperating defendant was unable to identify the other male.  As detailed above, Jose AISPURO-NIEBLA was identified by CHAVEZ as arranging the shipment of fentanyl and cocaine to

MARSHALL which was seized in Kansas. Case agents believe the fact that MARSHALL was observed meeting with AISPURO-NIEBLA in the Milwaukee area in July 2022 indicates that MARSHALL is still involved in narcotics trafficking with AISPURO-NIEBLA.

64.     Based on the above listed information, case agents believe Jonte MARSHALL is the user of **idtr_black@yahoo.com (TARGET ACCOUNT)**. Case agents believe that MARSHALL continues to use **idtr_black@yahoo.com (TARGET ACCOUNT)** to communicate with others to further his illegal distribution of controlled substances. Case agents believe the information requested will assist in identifying his source(s) of supply, stash locations, and other co-conspirators involved in the organization.

65.     Based on my training and experience, individuals who engage in interstate trafficking in controlled and non-controlled substances and other items used to enhance their drug trafficking activities via the internet will communicate and send and receive information through electronic communication such as e-mails and chats. Individuals engaged in criminal activity via the internet often remain anonymous by providing inaccurate or false information, but will often use e-mail accounts to conduct business and/or communicate with other co-conspirators. The true identity and location of these individuals can often be found by analyzing their e-mail communications and IP connection logs.

66.     In general, an e-mail that is sent to a Yahoo! subscriber is stored in the subscriber's "mail box" on Yahoo!'s servers until the subscriber deletes the e-mail. If the subscriber does not delete the message, the message can remain on Yahoo!'s servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to be available on Yahoo!'s servers for a certain period of time.

### III.     BACKGROUND CONCERNING E-MAIL

67.     In my training and experience, I have learned that Yahoo! provides a variety of on-line services, including electronic mail ("e-mail") access, to the public. Yahoo! allows subscribers to obtain e-mail accounts at the domain name Yahoo.com. Subscribers obtain an account by registering with Yahoo!. During the registration process, Yahoo! asks subscribers to provide basic personal information. Therefore, the computers of Yahoo! are likely to contain stored electronic communications (including retrieved and un-retrieved e-mail for Yahoo! subscribers) and information concerning subscribers and their use of Yahoo!'s services, such as account access information, e-mail transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

68.     In addition to email, Yahoo! offers its users a number of other online services. A list of those services and their features is available at the following URL: https://www.yahoo.com/everything.

69.     In my training and experience, e-mail providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail account. Such information can include the subscriber's full name, physical address, telephone numbers, and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

70.     In my training and experience, e-mail providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records

32

of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

71. In my training and experience, in some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

72. This application seeks a warrant to search all responsive records and information under the control of Oath Holdings, the legal entity operating Yahoo! email services, a provider subject to the jurisdiction of this court, regardless of where Oath Holdings has chosen to store such information. The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is

33

within Yahoo!'s possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.

## IV.    CONCLUSION

73.    Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that violations of violations of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Sections 1956 and 1957, have been committed by the user of the **TARGET ACCOUNT**, Jonte MARSHALL.  There is also probable cause to search the location described in Attachment A for fruits, evidence and instrumentalities of these crimes further described in Attachment B.

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the following email address that is stored at premises controlled by Oath Holdings, 701 First Avenue, Sunnyvale, CA 94089.

**Target Account: idtr_black@yahoo.com**

**ATTACHMENT B**

**Particular Things to be Seized**

I.      **Information to be disclosed by Oath Holdings (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is stored, held or maintained inside or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A, for the time periods of:

- January 1, 2016, through December 31, 2018; and

- May 11, 2022, to the present.

a.      The contents of all e-mails associated with the account, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      The types of service utilized;

d. All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e. All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken;

f. All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Yahoo!; and

g. For all information required to be disclosed pursuant to this warrant, the physical location or locations where the information is stored.

The Provider is hereby ordered to disclose the above information to the government within fourteen days of the issuance of this warrant.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Sections 1956 and 1957 and occurring after January 1, 2016, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a. The importation and distribution of controlled substances and other non-controlled substances or other items used to increase the volume of controlled substances and enhance drug trafficking activities.

b. Information relating to who created, used, or communicated with the account or identifier, including records about their identities and whereabouts.

c. Information relating to the laundering of proceeds of drug sales.

4

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by _____ [Provider], and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of _____ [Provider]. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of _____, and they were made by _____ [Provider] as a regular practice; and

b.      such records were generated by _____ [Provider] electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of _____ [Provider] in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by _____

[Provider], and at all times pertinent to the records certified here the process and system

functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of

the Federal Rules of Evidence.

_____          _____
Date                                             Signature

6